UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MELISSA POCHE                                    CIVIL ACTION NO. 10-450

                                                 JUDGE BRIAN JACKSON

VS.

                                                 MAGISTRATE JUDGE NOLAND

SID GAUTREAUX, ETC., ET AL                       JURY DEMAND

---

**REVISED AND ABRIDGED FIRST AMENDED AND RESTATED COMPLAINT
UNDER 42 USC §1983, 42 U.S.C. §12132, and 29 U.S.C. §794
AND ANCILLARY STATE LAW CLAIMS**

---

The first amended and restated complaint of MELISSA POCHE ("Plaintiff") represents:

### PARTIES

1.

Plaintiff, MELISSA POCHE, is an uninterdicted mentally ill person over the age of majority, domiciled in Louisiana and currently residing in a nursing facility. Undersigned counsel were retained on Plaintiff's behalf by Plaintiff's brother, who acts pursuant to a General Durable Power of Attorney executed by Plaintiff during a period of lucidity.

2.

Defendant, SID GAUTREAUX is the Sheriff of East Baton Rouge Parish ("EBR"), and is sued in his official capacity as Sheriff. For purposes of claims other than Section 1983 claims, he is sued as the employer of various deputy sheriffs, prison guards, and other employees for whom he is responsible in *respondeat superior*.

3.

Defendant, HILLAR MOORE, III is the District Attorney for EBR and is sued in his official capacity as District Attorney. For purposes of state law claims, he (as representative of

the Office of the District Attorney) is sued as the employer of various Assistant District Attorneys and other employees for whom he is responsible in *respondeat superior*.

4.

Defendant, DENNIS GRIMES is the Warden of the East Baton Rouge Parish Prison ("EBR Prison"), and is sued in his official capacity as Warden. For purposes of claims other than Section 1983 claims, he is sued as the employer of various prison guards and other employees of the EBR Prison for whom he is responsible in *respondeat superior*.

5.

Defendant MARK W. SHUMATE is the Sheriff of East Carroll ("EC") Parish and is responsible for the East Carroll/Riverbend Detention Center ("Riverbend"), and is sued in his official capacity as Sheriff. For purposes of claims other than Section 1983 claims, he is sued as the employer of various deputy sheriffs, prison guards, and employees for whom he is responsible in *respondeat superior*.

6.

Defendant ALVIN JONES is the Warden or Manager of Riverbend and is sued in his official capacity as Warden or Manager. For purposes of claims other than Section 1983 claims, he is sued as the employer of various prison guards and other employees of Riverbend for whom he is responsible in *respondeat superior*.

## JURISDICTION AND VENUE

7.

This court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as the primary claims arise under the laws of the United States, specifically 42 U.S.C. § 1983, 42 U.S.C. §12132, and 29 U.S.C. §794. The remaining claims herein arise under Louisiana law and are within this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

8.

Venue is proper in this district court pursuant to 28 U.S.C. § 1391(b) because many of the defendants reside in this judicial district and all defendants reside in the State of Louisiana. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL BASIS FOR SUIT

9.

Plaintiff, who was 54 years old at the time of the facts complained of, suffers from severe mental illness. She is schizophrenic and bipolar and suffers from organic brain disorder. Furthermore, her IQ is 73, which classifies her as having borderline mental deficiency. Her deficiencies were, at all relevant times, readily apparent and obvious to any reasonable observer.

10.

During the two weeks prior to July 22, 2009, the EBR Sheriff's office obtained abundant and clear evidence of Plaintiff's debilitating mental condition. Its records document several instances of bizarre behavior by the Plaintiff during that two week period, including a claim by Plaintiff of being raped on July 10 with bizarre circumstances surrounding the report of rape.

11.

On July 22, 2009, Plaintiff again engaged in bizarre and irrational behavior, this time at a convenience store, leading a store employee to call the EBR Sheriff's department. EBR Sheriff Deputies found Plaintiff wandering across the street from the store. As the deputies approached her, Plaintiff walked away from them, leading them to manhandle her, prompting her in her irrational state to try to wrestle away. The deputies charged her with misdemeanor charges of disturbing the peace, remaining after forbidden and resisting arrest, and added an old

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 3 of 30

misdemeanor charge for $93.28 in checks that Plaintiff had allegedly bounced in 2006 (but which, on information and belief, had been paid years before July 22, 2009).

12.

The deputies arrested Plaintiff and placed her in the custody of Warden Dennis Grimes at EBR Prison.

13.

Due to inadequate policies and entrenched customs of the defendants as detailed below, Plaintiff would then remain in jail for the next seven months without charges, without counsel, without arraignment, without a probable cause determination, and without accommodation for her obvious and known mental deficiencies and disabilities, among other violations of her federal constitutional and statutory rights, and alternatively, in violation of Louisiana tort law.

14.

La. Code Cr. Proc. art. 230.1 requires that the sheriff or law enforcement officer in custody of an arrested person must bring him promptly, and in any case within 72 hours from arrest, before **a judge** for the **purpose of appointment of counsel**. If the arrested person is not accorded this right, "he shall be released forthwith."

15.

The EBR Sheriff and Warden did not accord Plaintiff the right to appear before a judge or the right to any appearance for the purpose of appointment of counsel at any time during her seven-month incarceration, violating La. Code Cr. Proc. Art. 230.1 and related constitutional guarantees. Instead, on July 23, 2009, they placed Plaintiff (with a large group of other prisoners) by video link before an unelected court commissioner who was not a judge, the sole purpose of such "jail callout" being to set bond pursuant to a preset bail schedule. Plaintiff was not asked during this perfunctory "jail callout" if she had counsel, was not offered counsel, and

did not in fact receive appointed counsel. The appointment of counsel was not the purpose, or even **a** purpose, of the "jail callout."

16.

It was the official policy and established custom of the EBR Sheriff and Warden, at all relevant times, not to require their employees to follow the dictates of La. Code Cr. Proc. art. 230.1 but instead to place arrestees through a "jail callout" procedure before a non-judge. This was either an expressly adopted policy of the Sheriff and Warden or was a custom established for a long time with full knowledge of the Sheriff and Warden. The Sheriff and Warden knew that the person presiding over such "jail callout" procedure was not a judge, that the purpose of such procedure was *not for* the assignment of counsel, and that attorneys were in fact routinely not assigned to defendants during such "jail callout" procedures, and they therefore acted in conscious indifference to the constitutional violations that occurred as a result of their policies and customs.

17.

La. Code Cr. Proc. art. 230.2 provides in pertinent part that if a person is arrested without a warrant, he or she is entitled to a probable cause determination within 48 hours of arrest, to be made by a "magistrate." If not, the arrestee is to be released forthwith on his own recognizance.

18.

Plaintiff never received any probable cause determination by a magistrate (or anyone else), and yet she was held in prison for over seven months after her arrest. This was a violation of La. Code Cr. Proc. Art. 230.2 and related constitutional guarantees by the Sheriff and Warden. The unelected commissioner made no probable cause determination, and a commissioner does not qualify as a Magistrate under La. Code Crim. Proc. art. 230.2 in any event.

19.

It was the official policy and established custom of the EBR Sheriff and Warden, at all relevant times, not to require their employees to follow the dictates of La. Code Cr. Proc. art. 230.2 but instead to allow employees to place defendants through a "jail callout" video procedure before a non-magistrate. This was either an expressly adopted policy of the Sheriff and Warden or was a custom established for a long time with full knowledge of the Sheriff and Warden. The Sheriff and Warden knew that the person presiding over "jail callout" procedures was not a magistrate, that the purpose of such procedure was not for the determination of probable cause, and that probable cause determinations were in fact routinely not made during such "jail callout" procedures, and they therefore acted in conscious indifference to the constitutional violations that occurred as a result of their policies and customs.

20.

The EBR Sheriff and Warden knew that, as a result of their policies and customs, arrestees in EBR Prison were routinely held for more than 72 hours without assignment of counsel or offer of counsel, and that arrestees in EBR Prison were routinely held for more than 48 hours without a probable cause determination, and yet they purposefully failed to implement policies or customs to see that such arrestees were released from prison.

21.

The failure of the EBR Sheriff and Warden to place the Plaintiff before a judge for the purpose of receiving counsel, or before a magistrate for the purpose of a probable cause determination, resulted in the violation of Plaintiff's right to due process and the right to assistance of counsel, rights guaranteed to Plaintiff by the Sixth and Fourteenth Amendment of the United States Constitution. These failures further constituted a failure of the defendants to afford reasonable accommodation for persons suffering from severe mental disabilities and or to

act reasonably to prevent discrimination against such persons, as required by the Americans with Disabilities Act (the "ADA") and 29 U.S.C. §794 (Section 504 of the Rehabilitation Act of 1973, "Section 504").

22.

The EBR District Attorney received Plaintiff's file from the EBR Sheriff on August 18, 2009. Attached to the front of the file was a so-called "green sheet," which only specifically listed one of the four charges against Plaintiff, namely Resisting an Officer. The file to which it was attached listed and described all four of the charges brought by the deputies.

23.

The Assistant District Attorney in charge of Plaintiff's case, Kory Tauzin ("Tauzin"), has no idea who fills out the green sheets that accompany his assigned files. He received no training or instruction of any kind for his job, including no training in basic office procedures and processes such as who prepares the paperwork he signs. The green sheet was filled out either by employees of the EBR District Attorney or by employees of the EBR Sheriff or Warden.

24.

It is the policy and custom of the EBR District Attorney to allow assistant district attorneys to begin prosecuting cases without significant training, instruction or even basic explanation of office practices. Assistant District Attorneys are expected to learn how the office works, and how cases should be prosecuted, by trial and error as they go. They are not trained, for example, on how to properly drop cases or how to fill out release paperwork or how to follow up on release paperwork so as to assure that the arrestee is actually released. As a result, it was readily foreseeable to the District Attorney, and so obvious that any reasonable District Attorney would know, that Assistant District Attorneys would make errors in processing cases that denied arrestees their constitutional rights, and yet the District Attorney undertook no steps to properly

train assistant district attorneys in the proper processing of arrestees' files, which constitutes conscious indifference by the District Attorney to the danger of constitutional violations.

25.

It is the extablished policy and custom of the EBR Sheriff and Warden, or alternatively of the EBR District Attorney, to allow clerical personnel to fill out "green sheet" forms without oversight, training or instruction, and without verification of the form by anyone including the Assistant District Attorney receiving the form. It is the policy and custom of the EBR District Attorney to allow Assistant District Attorneys to accept and use "green sheets" without checking them against the file for completeness. It is the policy and custom of the EBR District attorney to allow Assistant District Attorneys to fill out release forms based solely on "green sheets" and without reviewing the arrest file to assure all charges are included on the release form. It was readily foreseeable to the EBR Sheriff, Warden and District Attorney, and so obvious that any reasonable sheriff, warden or district attorney would know, that such policies and customs would cause processing errors that would deny arrestees their constitutional rights, and yet neither the Sheriff nor the District Attorney undertook steps to require proper processing of files by their secretarial personnel, and the District Attorney undertook no steps to require assistant district attorneys to verify the completeness of forms accompanying their prosecutorial files. The dangers of constitutional violations were so open and obvious that the Sheriff's and District Attorney's inaction constitute conscious indifference to such constitutional violations.

26.

The policies and customs of the EBR Sheriff and Warden, or alternatively of the EBR District Attorney, were such that their employees routinely and customarily wrote only a subset of charges for which a person was arrested on the "green sheet" accompanying the arrest file. This routine custom or policy was so obvious and well-known, and the dangers of constitutional

violations due to improper paperwork handling that would arise from such policies and custom was so obvious to any reasonable observer, that the failure of the EBR Sheriff, EBR Warden or EBR District Attorney to correct such policies and customs constituted conscious indifference to the constitutional rights of arrestees.

27.

Tauzin rapidly decided to drop all of the charges against Plaintiff. On the cover of Plaintiff's file, which listed all four charges against her and contained the arrest records on all four charges, he checked "No Bill" on August 25, 2009, because "Police Action Sufficient." The DA's computerized records further showed all four charges and stated "No Bill-Police Action Sufficient" for all four charges. The Assistant District Attorney also wrote "N/B-PAS" on the green sheet. The DA's office then "Dead Filed" the record, considering the case closed.

28.

However, when Tauzin signed an "Authority to Change Booking" regarding Plaintiff, that form listed only one of the four charges against her. The EBR Sheriff/Warden therefore did not release her from prison, apparently believing there were still pending charges against her.

29.

It was the policy, standard practice and established custom of the EBR District Attorney, at all relevant times, to allow secretarial personnel to prepare "authority to change booking" forms without oversight, guidance or checking of the same by the Assistant District Attorney in charge of the file, and without checking the booking form against the file to assure that all intended charges are included in the "authority to change booking" form. Secretarial personnel in the district attorney's office follow these policies, practices and custom and do, in fact, wholly prepare such forms without direction, oversight or checking by the Assistant District Attorneys or other responsible personnel. These policies, practices and customs were so open and obvious

that the District Attorney either knew of it or should be charged with knowledge of it, and the danger of constitutional violations arising out of such customs, practices and procedures were so obvious that the failure to correct them constituted conscious indifference by the District Attorney to the constitutional rights of arrestees.

30.

It is the policy, standard practice and established custom of the EBR District Attorney, at all relevant times, to allow assistant district attorneys sign "authority to change booking" forms prepared completely by secretarial personnel, without checking of the file or other verification that the form has been prepared in accordance with their intent. The assistant district attorneys follow these policies, practices and custom and do, in fact, sign such crucial release forms wholly prepared by secretarial personnel without oversight or checking to determine that all appropriate charges are listed thereon. It is further the policy, custom and routine practice of the District Attorney's office not to follow up after charges are supposedly dropped to assure that the arrestee has in fact been released. These policies, practices and customs were so open and obvious that the District Attorney either knew of them or should be charged with knowledge of them, and the danger of constitutional violations arising out of such customs, practices and procedures was so obvious that the failure to correct them constituted conscious indifference by the District Attorney to the constitutional rights of arrestees.

31.

The District Attorney's policies and customs were such that if an arrestee was being held on multiple charges, and all charges were intended to be dropped, his employees could nevertheless list less than all charges against that arrestee on any detention change order transmitted to the prison. This routine custom or policy was so obvious and open, and the dangers of constitutional violations that would arise from such policies and customs was so

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 10 of 30

obvious and clear, that the failure to correct such policies and customs constituted conscious indifference by the District Attorney to the constitutional rights of arrestees.

32.

It is the policy, standard practice and established custom of the EBR Sheriff and of the Warden of the EBR Prison, when a booking form is received that lists some but not all of the charges pending, to continue to hold the arrestee in question in prison, without question and without attempting any communication whatsoever with the District Attorney's office to determine the Assistant District Attorney's intent concerning the prisoner's release. This is true despite the fact that the Sheriff and Warden know, or should know, that the forms in question are filled out by untrained secretarial personnel without effective oversight or indeed any oversight by the assistant district attorneys, the latter of whom simply "rubber-stamp" the forms wholly prepared by clerks. The routine custom or policy of assuming a prisoner was to be held was so obvious and well-known, and the dangers of constitutional violations that would arise from such policy and custom was so obvious, that the failure to correct such policy and custom to require reasonable communication with the District Attorney constituted conscious indifference by the Sheriff and Warden to the constitutional rights of arrestees.

33.

The error in the filling out and processing of the "Authority to Change Booking" form, and the failure of the Sheriff to release the Plaintiff, were the direct result of poor policies and customs of both the District Attorney's office and the offices of the EBR Sheriff and Warden, including those set forth in Paragraphs 24, 25, 26, 29, 30, 31, and 32.

34.

Defendants kept Plaintiff incarcerated for seven months, until February of 2010, with no charges pending against her, with no appearance before a judge or magistrate, with no

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 11 of 30

determination of probable cause, with no attorney offered to her or appointed for her, and with no one apparently doing anything about her case other than keeping her locked up in prison. Plaintiff had no ability to defend herself due to her mental disabilities and deficiencies and lack of counsel.

35.

On September 23, 2009, the issue of the Plaintiff's improper confinement without charges was **specifically brought to the attention of the EBR District Attorney's office** by a social worker at the EBR Prison, but the District Attorney's office once again failed to properly release the Plaintiff despite clear direct knowledge of the District Attorney's employes that Plaintiff was being wrongfully and illegally held.

36.

It was the policy and established custom of the EBR District Attorney, at all relevant times, to allow untrained secretarial personnel to handle telephone calls directly relevant to pending cases without any obligation to pass on the contents of phone calls to the responsible ADAs, to follow up in any way, or even to put a message in the file. The District Attorney failed to establish or enforce any policy requiring his employees to follow up when obtaining important information about prisoners, such as knowledge that a prisoner was being wrongfully, unlawfully or unconstitutionally detained. These customs, practices and omissions of policy were so open and obvious that the District Attorney either knew of them or should be charged with knowledge of them. The danger of constitutional violations arising out of such haphazard policies and customs was so open and obvious that the failure of the District Attorney to correct these policies and customs constitutes conscious indifference to the constitutional rights of arrestees.

37.

From July 22 to October 15, 2009, the wrongly imprisoned Plaintiff continued to engage in bizarre and irrational behavior in EBR Prison caused by her mental illnesses and mental deficiencies and over which she had no control. Numerous examples of behavior clearly showing her open and obvious mental defects and deficiency are documented in the records of the EBR Prison and/or the records of medical services personnel at the prison.

38.

Despite the obvious fact that Plaintiff was a disabled individual due to severe mental illness (and indeed by August 4 was specifically known by the prison doctor to be schizophrenic), the EBR Sheriff and Warden failed to provide any accommodation for her disability, due to their inadequate and improper customs and policies. Instead of providing reasonable accommodations for the disabled Plaintiff, these defendants **repeatedly punished** the Plaintiff with lockdowns and solitary confinement when she exhibited pronounced symptoms of her mental illness over which she had no control.

39.

The EBR Sheriff's and Warden's policies and customs were such that their deputies and employees were expected to and in fact did treat persons with severe mental disabilities as disciplinary problems and to punish such prisoners for failing to act like a non-disabled person would be expected to act. The employees were expected to, and by custom and regular practice did, punish individuals with severe mental disabilities by locking them up in their cell block or in solitary confinement and by depriving them of social interactions and exercise and access to facilities and services, when instead, the defendants should accommodate such prisoners' open and obvious disabilities. The obvious dangers of constitutional violations from such actions, not to mention violations of the Americans with Disabilities Act and the Rehabilitation Act, were

ignored by the Sheriff and Warden in encouraging or allowing these practices and customs, which a evidenced conscious indifference by the Sheriff and Warden to disabled prisoners' constitutional and statutory rights.

40.

The EBR Sheriff and Warden knew, or should be charged with knowledge, that their deputies and prison guards and employees were not properly trained to handle, care for or attempt to discipline persons with obvious and severe mental deficiencies. The lack of adequate and necessary training in this area was so obvious and known, and the danger of constitutional violations (and ADA/Section 504 violations) arising therefrom was so clear and obvious, that the failure to correct such matters constituted conscious indifference by the Sheriff and Warden to the rights of mentally disabled arrestees.

41.

The EBR Sheriff and Warden knew, or should be charged with knowledge, that their deputies and prison guards and employees, by entrenched custom and routine practice, did not bring the mental deficiencies of severely mentally disabled individuals to the attention of the district attorney, judge, commissioner or magistrate, did not undertake any effort to see that such individuals had obtained counsel or properly waived counsel, did not undertake any effort to obtain assistance or accommodation for such individuals' severe disabilities, and did not make any effort to provide adequate monitored psychiatric and other mental health services to such persons or to transfer them to mental health facilities. These customs of the EBR Sheriff and Warden's employees were so obvious and known, and the danger of constitutional violations (and ADA/Section 504 violations) arising therefrom were so clear and obvious, that the failure to correct such matters constituted conscious indifference by the Sheriff and Warden to the rights of mentally disabled arrestees.

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 14 of 30

42.

The employees of the EBR Sheriff and Warden knew or should be charged with knowledge that Plaintiff was severely disabled. They knew she needed accommodation in order to receive the public services accorded to other inmates, but they deliberately, or with conscious indifference to her rights, failed to provide those accommodations. Their repeated punishments of Plaintiff for acts she could not control, and their failure to provide any reasonable accommodation for her disability, constituted intentional violations of the ADA and Section 504.

43.

On October 15, 2009, Plaintiff was transported from EBR Prison to Riverbend, due to lack of jail space in EBR Prison to continue warehousing her. She was specifically known to be schizophrenic and bipolar at that time by prison employees in both parishes. It was plainly obvious upon transfer that Plaintiff was severely disabled as a result of mental illness, that she was, in fact, a disabled individual within the meaning of the ADA and Section 504, and therefore that the EC Sheriff and Riverbend Warden were required to provide reasonable accommodation for her disability. However, the EC Sheriff and Riverbend Warden chose not to implement any policies or regulations to detect and/or accommodate inmates with serious mental disabilities such as Plaintiff. Rather, the Riverbend Warden and the EC Sheriff repeatedly and continuously **punished Plaintiff** with solitary confinements and lockdowns, like their EBR counterparts, for behavior over which she had no control, instead of reasonably accommodating her illness.

44.

From October 15 to November 24, 2009, and again from December 4, 2009 through late February, 2010 (after a brief transfer back to EBR), Plaintiff was warehoused at the Riverbend facility. During these periods, Plaintiff continued to engage in well documented bizarre and irrational behavior caused by her disability and over which she had no control.

45.

Despite the obvious fact that Plaintiff was a disabled individual due to severe mental illness (and indeed upon transfer Plaintiff was specifically prescribed medications for schizophrenia, bipolar disorder and anxiety), the EC Sheriff and Riverbend Warden failed to provide any accommodation for her disability, due to inadequate and improper customs and policies. Instead of providing reasonable accommodations for the disabled Plaintiff, these defendants **repeatedly punished** the Plaintiff with lockdowns and solitary confinement when she exhibited pronounced symptoms of her mental illness over which she had no control.

46.

The EC Sheriff's and Riverbend Warden's policies and customs were such that their deputies and employees were expected to and in fact did treat persons with severe mental disabilities as disciplinary problems and to punish such prisoners for failing to act like a non-disabled person would be expected to act. The employees were expected to, and by custom and regular practice did, punish individuals with severe mental disabilities by locking them up in their cell block or in solitary confinement and by depriving them of social interactions and exercise and access to facilities and services, when instead, the defendants should accommodate such prisoners' open and obvious disabilities. The obvious dangers of constitutional violations from such actions, not to mention violations of the Americans with Disabilities Act and the Rehabilitation Act, were ignored by the Sheriff and Warden in encouraging or allowing these practices and customs, which a evidenced conscious indifference by the Sheriff and Warden to disabled prisoners' constitutional and statutory rights.

47.

The EC Sheriff and Riverbend Warden knew, or should be charged with knowledge, that their deputies and prison guards and employees were not properly trained to handle, care for or

attempt to discipline persons with obvious and severe mental deficiencies. The lack of adequate and necessary training in this area was so obvious and known, and the danger of constitutional violations (and ADA/Section 504 violations) arising therefrom was so clear and obvious, that the failure to correct such matters constituted conscious indifference by the Sheriff and Warden to the rights of mentally disabled arrestees.

48.

The EC Sheriff and Riverbend Warden knew, or should be charged with knowledge, that their deputies and prison guards and employees, by entrenched custom and routine practice, did not bring the mental deficiencies of severely mentally disabled individuals to the attention of the district attorney, judge, commissioner or magistrate, did not undertake any effort to see that such individuals had obtained counsel or properly waived counsel, did not undertake any effort to obtain assistance or accommodation for such individuals' severe disabilities, and did not make any effort to provide adequate monitored psychiatric and other mental health services to such persons or to transfer them to mental health facilities. These customs of the EC Sheriff's and Riverbend Warden's employees were so obvious and known, and the danger of constitutional violations (and ADA/Section 504 violations) arising therefrom were so clear and obvious, that the failure to correct such matters constituted conscious indifference by the Sheriff and Warden to the rights of mentally disabled arrestees.

49.

The employees of the EC Sheriff and Riverbend Warden knew or should be charged with knowledge that Plaintiff was severely disabled. They knew she needed accommodation in order to receive the public services accorded to other inmates, but they deliberately, or with conscious indifference to her rights, failed to provide those accommodations. Their repeated punishments

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 17 of 30

of Plaintiff for acts she could not control, and their failure to provide any reasonable accommodation for her disability, constituted intentional violations of the ADA and Section 504.

50.

The EBR Sheriff and Warden failed to implement policies and customs to assure that, if a prisoner was being physically housed in another parish's facility, the records and reports of that other facility were obtained and checked to assure that the other facility was properly treating the prisoner in accordance with the prisoner's constitutional and federal statutory rights. Had such policies and customs been in place as they should have been, the EBR Sheriff and Warden should have would have known of the repeated violations of the Plaintiff's constitutional and federal statutory rights at Riverbend and could have and should have prevented further such violations from occurring. The danger of constitutional violations (and ADA/Section 504 violations) arising from failure to implement policies and customs in this area were so clear and obvious, that the failure to correct such matters constituted conscious indifference by the EBR Sheriff and Warden to the rights of arrestees.

51.

Plaintiff, as a disabled individual within the meaning of federal law, should have been sent to a psychiatric facility or otherwise provided with ongoing, properly monitored and meaningful psychiatric care during her illegal imprisonment. Instead she was constantly subjected to punishment, locked up in a cage and discriminated against because her disability prevented her from acting in the manner that prison officials demanded.

52.

Meanwhile, when Plaintiff's family came to realize that she was missing, they began a systematic search for her, eventually finding her name in very early February 2010 on an internet listing of EBR Prison inmates. The family then began a long campaign of telephone calls and

-18-

emails with the EBR Sheriff's Office seeking to find out where she was being held and on what charges, a process that took over two weeks to complete. Despite massive bureaucratic red tape, in mid-February, Plaintiff's family began learning the facts set forth in this Complaint. Plaintiff, however, **still remained incarcerated**, until the press was alerted to the facts of the case and began to investigate the defendants' conduct. It was not until February 25, 2010, the day before the Baton Rouge Advocate ran Plaintiff's story, that Plaintiff was finally released from prison to a mental hospital.

53.

Meanwhile, upon learning of its blunders and failures in connection with Plaintiff's case in mid-February, the only initial action of the EBR District Attorney's office was to try to reinstitute one of the charges that it had previously and deliberately dropped! Knowing full well that Plaintiff was mentally disabled, and knowing full well that Plaintiff had been held for seven months illegally and unconstitutionally, the District Attorney's office did **not** act quickly to secure her immediate release but **instead** tried to keep her in jail by issuing a bill of information on February 19, 2010, charging Plaintiff **again** with issuing alleged NSF checks totaling $93.28 in 2006. It was only after public pressure had begun to build, one day before a major article in the Baton Rouge Advocate concerning Plaintiff's plight, that Tauzin dropped that charge again "so that [defendant] could get into Mental Hospital from jail."

54.

Tauzin has testified that he, personally, did not decide to charge the Plaintiff after the District Attorney's office learned of her seven-month wrongful imprisonment. Rather, he has testified, some unknown person in his office prepared the bill of information (after Plaintiff's plight had come to the full knowledge of the DA's office) and placed it on his desk, and he blindly signed the bill bringing new charges against the Plaintiff for the NSF check issue. Even

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 19 of 30

if this testimony is accepted as true, **someone** in the District Attorney's office made a conscious decision to bring belated charges against the wrongly imprisoned, severely disabled Plaintiff with full knowledge of her plight, and to slip the papers onto Tauzin's desk to be signed.

55.

It is the policy and custom of the District Attorney's office for Assistant District Attorneys to sign charging papers such as Bills of Information without reading them, without checking their correctness, and without even knowing what they are signing. This policy and custom was so open and obvious that the District Attorney either knew of it or should be charged with knowledge of it, and the danger of constitutional violations arising out of such custom and policy was so obvious that the failure to correct it constituted conscious indifference by the District Attorney to the constitutional rights of arrestees.

## COUNT ONE:
## DAMAGES UNDER 42 USC 1983
## AND ATTORNEYS' AND EXPERT FEES UNDER 42 USC 1988

56.

Plaintiff reavers and realleges Paragraphs 1-55 as fully as if set forth herein *in extenso*.

57.

This Count One is brought against all defendants, in their respective official capacities.

58.

The policies, customs, and decisions of Defendant SID GAUTREAUX, Sheriff of EBR, in his official capacity, were improper and grossly insufficient and legally caused the prolonged illegal incarceration of Melissa Poche and violation of her Constitutional and federal statutory rights, particularly as set forth in Paragraphs 16, 19, 25, 26, 32, 39, 40, 41, 42, and 50 of this Complaint and in such other ways as may be shown at the trial of this matter.

59.

The policies, customs and decisions of Defendant HILLAR MOORE, III, District Attorney for EBR, in his official capacity, were improper and grossly insufficient and legally caused the prolonged illegal incarceration of Melissa Poche and violation of her Constitutional and federal statutory rights, particularly as as set forth in Paragraphs 24, 25, 26, 29, 30, 31, 36 and 55 of this Complaint and in such other ways as may be shown at the trial of this matter.

60.

The policies, customs and decisions of Defendant DENNIS GRIMES, Warden of the EBR Prison, in his official capacity, were improper and grossly insufficient and legally caused the prolonged illegal incarceration of Melissa Poche and violation of her Constitutional and federal statutory rights, particularly as set forth in Paragraphs 16, 19, 25, 26, 32, 39, 40, 41, 42 and 50 of this Complaint and in such other ways as may be shown at the trial of this matter.

61.

The policies, customs and decisions of Defendant MARK W. SHUMATE, Sheriff of East Carroll Parish, in his official capacity, were improper and grossly insufficient and legally caused the prolonged illegal incarceration of Melissa Poche and violation of her Constitutional and federal statutory rights, particularly as set forth in Paragraphs 46, 47, 48 and 49 of this Complaint and in such other ways as may be shown at the trial of this matter.

62.

The policies, customs and decisions of Defendant ALVIN JONES, Warden or Manager of the East Carroll/Riverbend Detention Center, in his official capacity, were improper and insufficient and legally caused the prolonged illegal incarceration of Melissa Poche and violation of her Constitutional and federal statutory rights, particularly as set forth in Paragraphs 46, 47, 48 and 49 of this Complaint and in such other ways as may be shown at the trial of this matter.

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 21 of 30

63.

The choice of the respective defendants not to implement policies and/or to overturn entrenched customs, in an effort to eliminate the deficiencies detailed in this Complaint, was either a deliberate choice by each defendant or was the result of conscious indifference by each defendant to the obvious dangers of constitutional violations that would inevitably arise from the policies and customs in place.

64.

Each of the defendants acted under color of state law when taking their respective actions or inactions described herein.

65.

As a proximate and legal result of the acts of the defendants described herein, Plaintiff was deprived of her liberty without due process in violation of the 14th Amendment to the United States Constitution, was deprived of her right to assistance of counsel in violation of the 6th Amendment to the United States Constitution, was subjected to an unreasonable seizure of her person in violation of the 4th Amendment to the United States Constitution, and was discriminated against in application of the laws on the basis of her mental illnesses and defects in violation of the Equal Protection clauses of the 5th and 14th Amendments of the United States Constitution. The acts and omissions of the Sheriffs and Wardens also constituted violations of the ADA and Section 504.

66.

Additionally, as of a result the actions of the Sheriff defendants and Warden defendants as described herein, Plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. Plaintiff respectfully suggests that to throw a severely mentally handicapped person in jail, deprive her of a lawyer, deprive her of a

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 22 of 30

probable cause determination, and fail to get her proper medical care for her known and obvious mental deficiencies, and then to punish her any time her severe mental condition causes behavior she cannot control, without any accommodation for her illness, is the very model of cruel and unusual punishment.

67.

As a proximate and legal result of the defendants' actions herein, Plaintiff suffered significant actual damage, including damages for mental anguish and emotional distress, fright, depression, deprivation of medical care, and deprivation of liberty, all in amounts to be determined by the trier of fact.

68.

Plaintiff is entitled to recover, as the prevailing plaintiff and in the court's discretion, a reasonable attorney's fee and to recover any expert witness fees she may incur herein pursuant to 42 USC § 1988(b) and (c).

69.

The defendants named herein are all jointly and severally liable for any compensatory damages, attorneys' fees or expert fees that may be awarded herein.

### COUNT TWO:
### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT OF 1973

70.

Plaintiff reavers and realleges Paragraphs 1-69 as fully as if set forth herein *in extenso*.

71.

This Count Two is brought against all defendants, except Hillar Moore, in their respective official capacities. This Count Two is not brought against and does not apply to Hillar Moore in any capacity.

-23-

72.

Plaintiff's severe mental disabilities prevent her from engaging in major life activities, including working and caring for herself, and she is a disabled individual within the meaning of the ADA and Section 504.

73.

The damages complained of herein resulted from Defendants' failure to implement policies and customs that would provide a reasonable accommodation for persons suffering from severe mental disabilities, in violation of the ADA and Section 504.

74.

Appropriate accommodations would have included the provision of mental health services to persons, including Plaintiff, who were obviously disabled as a result of mental illness which would have assisted in making sure such persons had been brought before a judge in a timely manner and were represented by counsel and otherwise received due process such as a probable cause determination.  Defendants deliberately denied Plaintiff the benefit of such governmental services and/or discriminated against her because of her disability.

75.

Instead of accommodating her open and obvious disability, the defendants repeatedly punished her for failing to act as a non-disabled person would be expected to act, which is tantamount to punishing a deaf prisoner for not responding to verbal commands or punishing a paraplegic prisoner for not standing when ordered to do so.

76.

The acts and omissions of the defendants denied Plaintiff governmental benefits and services and, in fact, directly discriminated against Plaintiff, a disabled individual within the meaning of the above federal statutes, and failed to provide a reasonable accommodation for her

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 24 of 30

obviously disabling mental illness, and violated the rights secured to Plaintiff by the ADA and Section 504.

77.

Plaintiff specifically alleges that the Sheriffs and Wardens, through their employees, knew they were dealing with a severely mentally disabled individual.  The employees of the Sheriffs and Wardens deliberately punished that mentally disabled individual, over and over again, for her inability to accord her conduct to the same level as non-disabled individuals, rather than accommodating her disability as the ADA and Section 504 require.  Plaintiffs allege that the Sheriffs' and Wardens' employees acted with a discriminatory animus toward the mentally disabled in so doing, or at least with clear knowledge that a discriminatory impact upon mentally disabled individuals would occur as a result of their actions.

78.

As a proximate and legal result of the defendants' violations of the ADA and Section 504, Plaintiff suffered significant actual damage, including damages for mental anguish and emotional distress, fright, depression, deprivation of medical care, and deprivation of liberty, all in amounts to be determined by the trier of fact.

79.

Plaintiff is additionally entitled to recover a reasonable attorney's fee pursuant to the ADA and the Rehabilitation Act of 1973.

80.

The defendants named herein, except for Hillar Moore as District Attorney, are jointly and severally liable for any compensatory damages and attorneys' fees that may be awarded under this Count Two.

## COUNT THREE:
## FALSE IMPRISONMENT UNDER LOUISIANA LAW

81.

Plaintiff reavers and realleges Paragraphs 1-80 as fully as if set forth herein *in extenso*.

82.

This Count Three is brought against all defendants, both for their own acts and omissions in the implementation and non-implementation of policies and customs, and also in *respondeat superior* for the acts and omissions of their respective employees.

83.

The actions and inactions of the defendants named herein, in addition to constituting violations of 42 U.S.C. § 1983, the ADA and Section 504, or in the alternative thereto, constitute the tort of false imprisonment under Louisiana state law.

84.

Plaintiff shows that as a proximate and legal result of the actions and inaction of the defendants as set forth herein, she was restrained for some seven months against her will and without statutory or legal authority. If any lawful authority existed to detain her at the time of her arrest, that authority disappeared when (a) Plaintiff was not presented to a judge within 72 hours of her arrest for the purpose of having an attorney appointed or assigned; (b) she received no probable cause determination within 48 hours of arrest; and/or (c) when all charges were supposed to have been dropped against her in August 2009.

85.

As a proximate and legal result of the defendants' actions herein, Plaintiff sustained actual damage in an amount to be determined by the trier of fact at trial. Actual damages include

damages for mental anguish and emotional distress, fright, depression, deprival of medical care, and deprivation of liberty, all in amounts to be determined by the trier of fact.

86.

Plaintiff alleges that the defendants named herein are liable in *respondeat superior* under Louisiana law for the tortious acts and omissions of their respective employees, which employees in each case acted within the course and scope of their respective employments.

87.

The tortious acts of the defendants, through their employees for whom they are responsible, as alleged in this Complaint, were ministerial and administrative in nature and did not involve discretionary determinations by the defendants. Defendants are not entitled to absolute immunity for such non-discretionary, ministerial and administrative acts and omissions under Louisiana Supreme Court precedent. Plaintiff specifically alleges that any lower court cases in nonconformity the said Supreme Court precedent – for example, any cases that impose a "malice" requirement even for non-discretionary ministerial acts – are outdated and were impliedly overruled, or alternatively, were simply wrongly decided and this Court is not bound by them.

88.

The defendants named herein are all solidarily liable, or alternatively, jointly liable, for any damages that may be awarded to Plaintiff for false imprisonment.

## COUNT FOUR:
## NEGLIGENCE UNDER LOUISIANA LAW

89.

Plaintiff reavers and realleges Paragraphs 1-88 as fully as if set forth herein *in extenso*.

90.

This Count Four is brought against all defendants, both for their own acts and omissions in the implementation and non-implementation of policies and customs, and also in *respondeat superior* for the acts and omissions of their respective employees.

91.

The actions and inactions of the defendants named herein, in addition to the other causes of action stated herein, or in the alternative thereto, render the defendants liable under La. Civ. Code art. 2315, which provides that "Every act whatever of a man that causes damage to another obliges him by whose fault it happened to repair it" and under La. Civ. Code art. 2316, which provides that "Every person is responsible for the damages he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

92.

Plaintiff shows that as a proximate and legal result of the negligent actions and inactions of the defendants as set forth herein, she was restrained for some seven months and suffered numerous violations of her Federal and Louisiana constitutional and statutory rights.

93.

As a proximate and legal result of the defendants' actions herein, Plaintiff sustained actual damage in an amount to be determined by the trier of fact at trial. Actual damages include damages for mental anguish and emotional distress, fright, depression, deprival of medical care, and deprivation of liberty, all in amounts to be determined by the trier of fact.

94.

Plaintiff alleges that the defendants named herein are liable in *respondeat superior* under Louisiana law for the tortious acts and omissions of their respective employees, which employees in each case acted within the course and scope of their respective employment.

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 28 of 30

95.

The tortious acts of the defendants, through their employees for whom they are responsible, as alleged in this Complaint, were ministerial and administrative in nature and did not involve discretionary determinations by the defendants. Defendants are not entitled to absolute immunity for such non-discretionary, ministerial and administrative acts and omissions under Louisiana Supreme Court precedent. Plaintiff specifically alleges that any lower court cases in nonconformity the said Supreme Court precedent – for example, any cases that impose a "malice" requirement even for non-discretionary ministerial acts – are outdated and were impliedly overruled, or alternatively, were simply wrongly decided and this Court is not bound by them.

96.

The defendants named herein are all solidarily liable, or alternatively, jointly liable, for any damages that may be awarded to Plaintiff for general torts under arts. 2315 and 2316.

## JURY DEMAND

97.

Plaintiff demands a trial by jury as to all issues so triable.

WHEREFORE, Plaintiff, MELISSA POCHE, prays for a trial by jury further prays that there be judgment in her favor and against the defendants named herein, in solido or alternatively jointly, for compensatory damages in an amount to be determined by the trier of fact, and reasonable attorneys' fees and expert fees, as well as legal interest from date of judicial demand until paid, all costs of these proceedings, and all other general and equitable relief allowed by law.

-29-

Case 3:10-cv-00450-BAJ -CN   Document 38   06/10/11   Page 29 of 30

BY ATTORNEYS:

**MOORE, THOMPSON & LEE, APLC**

/s/ S. Layne Lee_____
Charles R. Moore (Trial Attorney), La. Bar Roll No. 9604
S. Layne Lee, La. Bar Roll No. 17689
6513 Perkins Road
Baton Rouge, Louisiana 70808
Telephone: (225) 766-1100
Facsimile: (225) 767-4486
COUNSEL FOR PLAINTIFF, MELISSA POCHE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been filed using the Court's electronic filing system, and that counsel for all parties have been served via the Court's electronic service processes, on this the 9th day of June, 2011

/s/ S. Layne Lee_____
Attorney